DECISION AND JUDGMENT
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas that found appellant guilty of one count of murder in violation of R.C. 2903.02(A) and 2929.02. For the following reasons, the judgment of the trial court is affirmed.
 {¶ 2} Appellant sets forth seven assignments of error: *Page 2 
 {¶ 3} "I. The trial court abused its discretion to the prejudice of appellant, Damiene A. Boles, in admitting hearsay. Trial Tr. vol. III, 422:8 — 14; 516:20 — 517:13.
 {¶ 4} "II. The verdict was not supported by sufficient evidence in violation of Boles' right to due process of law as guaranteed by theFourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. Trial Tr. vol. II, III, IV, V.
 {¶ 5} "III. The conviction for murder was against the manifest weight of the evidence in violation of Boles' right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. Trial Tr. vol. II, III, IV, V.
 {¶ 6} "IV. The trial court erred to the prejudice of Boles by limiting his ability to cross examine a witnesses [sic] in order to impeach another witness in violation of his due process rights under the Fifth,Sixth, and Fourteenth Amendments to the United States Constitution and the applicable provisions of the Ohio Constitution, and is contrary to the express provisions of Evid. R. 616. Trial Tr. vol. IV, 726:9 — 13.
 {¶ 7} "V. Prosecutorial misconduct deprived Boles of a fair trial in violation of his rights under the Fifth, Sixth, andFourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution. This misconduct constitutes plain error. Trial Tr. vol. V, 918:2 — 12, 14 — 15; 922:19 — 20; 923:23-924:3. *Page 3 
 {¶ 8} "VI. Boles was denied effective assistance of counsel in violation of his rights guaranteed by the Sixth andFourteenth Amendments of the United States Constitution and Article I, Section 10
of the Ohio Constitution. Trial Tr. vol. III, 471-502; vol. IV, 739:1 — 740:1; vol. V, 918:2 — 12, 14 — 15; 922:19 — 20; 923:23 — 924:3; State's Exhibit 80.
 {¶ 9} "VII. Cumulative error deprived Boles of a fair trial in violation of his rights under the Fifth, Sixth, andFourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution. Trial Tr. vol. II, III, IV, V."
 {¶ 10} The undisputed facts relevant to the issues raised on appeal are as follows. Cori Key was murdered in Toledo, Ohio, sometime after 12:00 a.m. on July 31, 2004. Her body was found in her home by her father in the early evening hours of July 31; she had been stabbed twice, once through the heart. Appellant, who was Key's boyfriend and the father of one of her children, was identified as a suspect. Appellant submitted to a police interview in the hours immediately following the murder but he was not charged with the crime and the case went cold for more than two years. The case eventually was reopened, and, in December 2006, appellant was indicted for Key's murder. Appellant entered a plea of not guilty and was tried by a jury. A verdict of guilty was returned on July 19, 2007, and the trial court imposed a sentence of 15 years to life.
 {¶ 11} In support of his first assignment of error, appellant asserts that the trial court improperly allowed into evidence two hearsay statements. The first statement he *Page 4 
challenges was made by Key's friend and neighbor, Rubin Smith, who testified that Key told him appellant said he would kill her. According to Smith's testimony, Key came to him while she was talking to appellant on her cell phone and, while still on the phone, asked Smith to tell her father that appellant was talking about killing her. Smith testified: "She asked me I appreciate it if you tell my father something because something bad going to happen, and then I asker her what. She said, well, my boyfriend, he was talking about killing me." Over appellant's objection, the trial court admitted the statement based on the "state of mind" exception to hearsay under Evid. R. 803(3).
 {¶ 12} Appellant argues that the statement should not have been admitted under the state of mind exception to the hearsay rule. For the reasons set forth below, this court finds that Smith's statement was properly admitted as an exception to hearsay, although it should have been admitted as an excited utterance pursuant to Evid. R. 803(2).
 {¶ 13} A statement, other than one made by the declarant, offered in evidence to prove the matter asserted is hearsay, Evid. R. 801(C), and is generally inadmissible. Evid. R. 802. There are numerous exceptions to the rule, however, as set forth in Evid. R. 803 and 804. As with other evidentiary rulings, the determination of whether hearsay statements are subject to exception rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.State v. Hand, 107 Ohio St.3d 378, 393, 2006-Ohio-18, ¶ 92. An abuse of discretion is more than an error in judgment or a mistake of law; it connotes that the court's attitude is arbitrary, unreasonable or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217. *Page 5 
 {¶ 14} Evid. R. 803(2) provides an exception to the rule excluding hearsay if the out-of-court statement was an excited utterance — that is, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 15} In State v. Duncan (1978), 53 Ohio St.2d 215, the Ohio Supreme Court established a four-part test to determine whether a hearsay statement is admissible under Evid. R. 803(2). Id. at paragraph one of the syllabus, approving and following Potter v. Baker (1955),162 Ohio St. 488, paragraph two of the syllabus. Under this test, it must be established that: (1) there was an event startling enough to produce a nervous excitement in the declarant; (2) the statement must have been made while under the stress of excitement caused by the event; (3) the statement must relate to the startling event; and (4) the declarant must have had an opportunity to personally observe the startling event. Id.
 {¶ 16} In this case, we find that Key's experience of hearing appellant threaten to kill her was startling enough to cause her to go immediately to Smith and relay the information to him. She was still under the "nervous excitement" created by the threats when she spoke to Smith since she was still on the phone with appellant, and what she communicated to Smith clearly related to the startling event. Finally, Key clearly had an "opportunity to observe personally the matters asserted" in her statement by virtue of hearing appellant's threatening words over the phone. *Page 6 
 {¶ 17} Based on the foregoing, we conclude that the trial court properly ruled that Smith's statement was admissible as a hearsay exception, although we find that the statement qualifies as an excited utterance under Evid. R. 803(2) rather than as a "state of mind" exception. We are able to come to this resolution based on the decision in State v. Peagler, 76 Ohio St.3d 496, 501, 1996-Ohio-73, which holds that an appellate court may decide an issue on grounds different from those determined by the trial court, so long as the evidentiary basis on which the appellate court decides a legal issue was adduced before the trial court and made a part of the record thereof. The record in this case satisfies the standard required by Peagler. We therefore find that appellant's first argument under his first assignment of error is without merit.
 {¶ 18} As his second argument in support of his claim that the trial court improperly admitted hearsay statements, appellant cites the testimony of Satyra Hodrick that Key told her a neighbor said she saw appellant break into Key's house that evening. Key had been gone for several hours during the evening having dinner with Hodrick and some other friends. Appellant asserts that Hodrick's testimony constitutes inadmissible double hearsay.
 {¶ 19} Pursuant to Evid. R. 805(5), hearsay within hearsay is admissible if each part of the combined statements conforms with an exception to the hearsay rule. Therefore, in order for Hodrick's statement to be admissible, the neighbor's statement to Key and Key's subsequent statement to Hodrick must both fall under an exception to the hearsay rule. *Page 7 
 {¶ 20} The admissibility of this testimony was addressed in a side-bar discussion prior to Hodrick's testimony. At that time, the trial court ruled that the neighbor's telling Key about the break-in when Key returned from dinner and Key's call to Hodrick after she talked to her neighbor both were excited utterances. After the trial court's ruling, Hodrick testified that Key called her shortly before midnight on the night of her death and told Hodrick her neighbor had said appellant had broken into her house while Key and Hodrick were out to dinner. Hodrick testified that Key was upset when she called.
 {¶ 21} Upon review of the foregoing, we find that the trial court did not abuse its discretion by allowing Hodrick's statement as an exception to hearsay under Evid. R. 805(5).
 {¶ 22} Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 23} In his second assignment of error, appellant asserts that his conviction was not supported by sufficient evidence. As his third assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence. These arguments will be considered together as both can be resolved by examining the evidence presented at trial.
 {¶ 24} "Sufficiency" of the evidence is a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. State v. Thompkins (1997), 78 Ohio St.3d 380,386, 1997-Ohio-52. When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, *Page 8 
would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. A conviction that is based on legally insufficient evidence constitutes a denial of due process, and will bar a retrial. Thompkins, supra, at 386-387.
 {¶ 25} In contrast, a manifest weight challenge questions whether the state has met its burden of persuasion. Thompkins, at 387. In making this determination, the court of appeals sits as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, supra, at 38, citing State v. Martin, (1983),20 Ohio App.3d 172, 175.
 {¶ 26} Appellant was convicted of murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 27} In support of his second and third assignments of error, appellant states that none of the witnesses were able place appellant at the scene of the crime. Appellant essentially argues that the testimony of Key's neighbor Rubin Smith, who said he saw appellant leaving Key's house on the night of the murder, was unclear. *Page 9 
 {¶ 28} The jury in this case heard extensive testimony on behalf of the state from 11 family members, friends and acquaintances of the victim, the Lucas County deputy coroner, seven police officers, and two forensic scientists. The defense presented four witnesses, one of whom was a friend of appellant and three of whom were employees of a bar where appellant was seen the night of the murder.
 {¶ 29} Key's father testified that he discovered Key's body in the bathroom of her home at approximately 6 p.m. on July 31, 2004, and immediately called 911. Key's father also testified that when he was standing outside the house after the police arrived, appellant approached him and said that when the police tested Key's fingernails for DNA evidence they would see that he did not murder her. Additionally, Key's friend, Cheri Thompson, testified that appellant went to see her the day after the murder and told her that the police would not find his DNA under Key's fingernails because he did not kill her. He also told Thompson that he would not have to break into Key's house because he had his own key. Thompson described Key's and appellant's relationship as "abusive."
 {¶ 30} Yvonne Booth testified that Key had a manicure before they went out to dinner on July 30. When shown a photograph of Key's fingernails after the murder, Yvonne stated that Key's nails were a lot shorter in the photo and did not look the same as they had earlier in the evening. Kenneth Johnson testified that he was a nail technician and gave Key a manicure on July 28 or 29, 2004. When he was shown the photograph of Key's fingernails after her death, he stated that it did not depict his work and that he had never seen her with fingernails that short. *Page 10 
 {¶ 31} Several police officers testified as to the condition of the scene when they responded to the initial call from Key's father. The Lucas County deputy coroner testified as to her examination of the body at the scene and during the autopsy. She stated that she was unable to find any DNA evidence under Key's fingernails.
 {¶ 32} Several of Key's friends testified that they went out to dinner with Key on the evening of July 30, 2004. Satyra Hodrick testified that Key dropped her off at home around 10:00 p.m. At approximately 11:45, Key called Satyra and said appellant had broken into her house. Key sounded upset and Satyra told her to go somewhere else for the night. She did not hear from Key again.
 {¶ 33} Key's friend, Teshauna Isaac, also testified that Key called her shortly before midnight using another friend's phone and said someone had pushed her window air conditioner in and gone into her house; shampoo had been poured into her two house phones so they would not work. Key told Teshauna that she was going back home to lock up and go to bed. Teshauna did not hear from her again. Teshauna testified that Key had been talking about breaking up with appellant for several months prior to the murder. Teshauna further testified that in April 2004, she took Key home after Key and appellant had an argument while the three of them were out at a local bar. When Teshauna returned to the bar after taking Key home, appellant told her he was going home "to beat his bitch ass." Teshauna left the bar later and went to Key's house. When she knocked on the door, appellant answered; he said he did not want any "bitches" calling the house and punched Teshauna in the face. Although Key and appellant still *Page 11 
saw each other after that night, Key made appellant move out of her house and changed the locks. Teshauna considered appellant to be jealous and controlling and testified that Key was afraid of appellant. Key's friend, Harriett Hardy, also testified to her belief that Key was afraid of appellant.
 {¶ 34} Sevequa Glenn, Key's neighbor, testified that after dark on the night of the murder she saw appellant, whom she knew was Key's boyfriend, drive up, park his car on the street, and walk to Key's house. Glenn saw appellant "mess with" one of the windows as if he were trying to open it. Glenn did not watch appellant continuously but saw him leave approximately 30 minutes later. As soon as appellant left, Glenn saw Key drive up. She crossed the street and told Key she had just seen appellant at her house.
 {¶ 35} Rubin Smith, another of Key's neighbors, testified that he woke up in the middle of the night on July 31, 2004, and while he was looking out his kitchen window, saw appellant leave Key's house and run to her garage. Smith stated that there is a light behind Key's house and that he had no doubt it was appellant he saw. Appellant was wearing jeans, a leather jacket and gloves. Smith saw appellant back out of Key's garage on his motorcycle and slowly drive away. Smith further testified that the following afternoon, when he was standing outside with other onlookers after the police arrived, appellant approached him and asked if he had heard or seen anything; Smith said he had not. Appellant then told Smith that if he said anything to the police "something bad was going to happen." Smith later told a detective what appellant had said. *Page 12 
 {¶ 36} Sergeant Tim Campbell, who interviewed appellant after investigating the crime scene, testified that appellant had "fresh scratches" on his stomach and back. Appellant told him he was scratched the night before while shadowboxing with a friend. He told Campbell that he had his shirt on while shadowboxing.
 {¶ 37} Jeannine Lamb testified that she lived next door to Key and that on the night of the murder she heard a motorcycle directly outside at approximately 3:00 a.m. but did not see who was driving it. She further testified that appellant later "confronted" her and said "he knows where I stayed at," which frightened her. Appellant then told her that if she told anybody what she knew, "something would happen to me."
 {¶ 38} Toledo Police Sergeant Steve Forrester, supervisor of the cold case unit, testified that the unit decided to reopen Key's murder case in 2006, upon the request of the original detective. Forrester testified that the unit examined phone records from three of appellant's phones and two of Key's phones prior to the murder and compared them to the statements appellant gave the police at that time. The detectives concluded that, based on those comparisons, statements appellant gave during his interview with the original detective in 2004 could not have been true. In support of that conclusion, while acknowledging that the phone records cannot identify the individual making the calls, Forrester provided the following information. Between 4:26 p.m. and 9:15 p.m. on the evening of the murder, appellant placed 54 calls to Key. Also, during a one-hour period that evening — when appellant had told detectives that Key was with him at work — phone records showed outgoing calls from Key's home phone, one of which was to appellant's *Page 13 
cell phone. There also was an outgoing call from appellant's business phone to Key's home phone during that time. Additionally, although appellant told the police that he went to Key's house between 9:00 p.m. and 10:00 p.m. that evening looking for her, the records showed 16 calls from his business phone during that time frame. Lastly, despite having told police he was at the bar from 10:00 p.m. until 1:00 a.m. that night, the phone records show at least nine calls made from appellant's business shortly after 10:00 p.m. Nine more were made shortly after midnight, also from his business. In all, between 10:06 a.m. on July 30, 2004, and 2:39 a.m. on July 31, 2004, a total of 93 calls were made from appellant's business and cell phones to Key's phones; 24 of those calls were made between 12:01 a.m. and 12:58 a.m. on July 31.
 {¶ 39} Forrester also testified to other inconsistencies between appellant's statements to police the day of the murder and his statements to Forrester when the case was reopened. Those statements concerned such issues as appellant's and Key's whereabouts on the evening of the murder, whether or not appellant knew that Key was going out to dinner with friends that evening, and whether he and Key were planning on getting married in two weeks. Forrester also noted inconsistencies in appellant's statements regarding whether he was bothered by Key's going out to dinner with her friends, whether he was angry that she did not answer his calls that evening, whether he was concerned about her plans to leave town with friends that weekend, and whether the scratches on his chest happened while "play fighting" with a friend or during sex with Key the night before the murder. *Page 14 
 {¶ 40} The defense presented testimony from the bouncer at the bar the night of the murder, who recalled appellant being there for a while but did not know when he arrived or when he left. In contrast to appellant's original statement to police that scratches on his chest were the result of horseplay at the bar, the bouncer denied seeing appellant or anyone else "play fighting" enough to get scratched. The manager of the bar and the bar's owner both also confirmed that appellant was there but could not confirm exactly when appellant left.
 {¶ 41} This court has thoroughly considered the entire record of proceedings in the trial court and the testimony as summarized above and finds that the state presented sufficient evidence from which, when viewed in a light most favorable to the state, a rational trier of fact could have found appellant guilty beyond a reasonable doubt of murder in violation of R.C. 2903.02(A). See State v. Jenks (1991),61 Ohio St. 3d 259, syllabus.
 {¶ 42} As this court has consistently affirmed, the trier of fact is vested with the discretion to weigh and evaluate the credibility of conflicting evidence in reaching its determination. It is not within the proper scope of the appellate court's responsibility to judge witness credibility. State v. Hill, 6th Dist. No. OT-04-035, 2005-Ohio-5028
at ¶ 42. Further, based on the testimony summarized above and the law, this court cannot say that the jury clearly lost its way or created a manifest miscarriage of justice by finding appellant guilty of the charge of murder. State v. Thompkins (1997), 78 Ohio St.3d 380, *Page 15 
387, quoting State v. Martin (1983), 20 Ohio App.3d 172. Accordingly, we find that appellant's second and third assignments of error are not well-taken.
 {¶ 43} In his fourth assignment of error, appellant asserts that the trial court improperly limited the cross-examination of Jeannine Lamb by the defense, thereby violating his Sixth Amendment right to confront witnesses against him. Appellant argues that counsel was attempting to impeach the testimony of Rubin Smith through its cross-examination of Lamb. Rubin Smith, Key's next-door neighbor, had testified as to what he observed the night of the murder. While cross-examining Smith as to what he saw while looking out his window on the night of the murder, defense counsel asked Smith if he had been drinking or taking any substance "that would make it difficult for you to see anything[.]" Smith responded that he had not. Later, while cross-examining Lamb, who lived with Smith at the time of the murder, defense counsel asked Lamb if Smith had a drug habit. The state objected and the trial court sustained the objection. The trial court explained that the attempt at impeachment was improper because Smith had already testified on that point and because Smith could not be cross-examined on Lamb's testimony as to his drug use. Appellant now argues that Lamb's answer to the question regarding whether Smith had a drug habit would have been relevant to Smith's credibility.
 {¶ 44} It is well-settled that "`the scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge.'" State v.Lundgren, 73 Ohio St.3d 474, 487, 1995-Ohio-227, quoting *Page 16 O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163. Thus, when the trial court allows or disallows certain testimony, the order or ruling of the court will not be reversed absent a clear and prejudicial abuse of discretion. O'Brien at 163.
 {¶ 45} Appellant's attempt in the trial court to question Lamb about Smith's drug use was intended to discredit Smith's character. However, pursuant to Evid. R. 608(B), specific instances of a witness's conduct, for the purpose of attacking or supporting his character for truthfulness (other than conviction of crime as provided in Evid. R. 609), may not be proven by extrinsic evidence such as Lamb's testimony.
 {¶ 46} Defense counsel's proposed line of questioning would not have assisted the jury in evaluating Smith's credibility since Smith had already been asked on cross-examination whether he used any substances the night of the murder. Smith responded that he had not, and defense counsel did not pursue the matter. We are unable to find that the trial court's ruling limiting the cross-examination of Lamb as to Smith's possible drug use was unreasonable, arbitrary or unconscionable. Accordingly, the trial court did not abuse its discretion and appellant's fourth assignment of error is not well-taken.
 {¶ 47} In his fifth assignment of error, appellant asserts that several statements made by the prosecutor during rebuttal closing argument constituted misconduct. Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. State v.Ballew, 76 Ohio St.3d 244, 1996-Ohio-81. In closing arguments, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990),51 Ohio St.3d 160, 165. *Page 17 
"Moreover, because isolated incidents of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." State v.Stevens, 2d Dist. No. 19572, 2003-Ohio-6249.
 {¶ 48} In the case before us, because defense counsel failed to object to any of the statements made by the prosecutor, our review of the alleged improper statements is discretionary and limited to plain error only. Crim. R. 52(B) provides that "* * * plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the trial court." However, this court has held that "* * * notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. In order to prevail on a claim governed by the plain error standard, appellant must demonstrate that the outcome of his trial would clearly have been different but for the errors he alleges." State v. Jones, 6th Dist. No. L-05-1101, 2006-Ohio-2351, ¶ 72. (Citations omitted.)
 {¶ 49} First, appellant claims that the evidence did not support the prosecutor's assertion that appellant went into the victim's house and tried to force sex on her. Second, appellant argues that the prosecutor inaccurately stated that witness Rubin Smith testified that Key's garage door was open when he saw appellant run from the house. The record reflects that the prosecutor's statement did conflict with that of the witness. Third, appellant argues that the prosecutor improperly stated that Smith's testimony that he saw appellant's motorcycle at Key's house that night was consistent with other evidence. Finally, appellant argues that the prosecutor improperly vouched for the credibility of *Page 18 
Lamb and Smith when he stated, "We would submit to you [Lamb is] stone cold sober when she hears that from him, and the same thing with Rubin." The prosecutor was referring to Lamb's and Rubin's testimony that appellant threatened them with harm if they told anyone what they saw the night of the murder.
 {¶ 50} This court has reviewed the state's rebuttal closing argument in its entirety. We have also considered the prosecutor's statements in the context of all of the evidence presented at trial. Upon consideration thereof and the law, we find that the trial court did not commit plain error by allowing the jury to hear the prosecutor's statements without objection and, further, that appellant has not demonstrated that the outcome of his trial would clearly have been different but for the prosecutor's statements. Accordingly, we find appellant's fifth assignment of error not well-taken.
 {¶ 51} In his sixth assignment of error, appellant asserts that he was denied effective assistance of counsel in several respects. To prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result. The standard requires appellant to satisfy a two-prong test. First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that, but for counsel's perceived errors, the results of the proceeding would have been different.Strickland v. Washington (1984), 466 U.S. 668. This test is applied in the context of *Page 19 
Ohio law that states that a properly licensed attorney is presumed competent. State v. Hamblin (1988), 37 Ohio St.3d 153.
 {¶ 52} First, appellant asserts that trial counsel should have objected when the coroner testified as to the victim's estimated time of death. Appellant argues that the opinion was not rendered "to any degree of scientific certainty, probability, or even possibility" and that it was not based upon any "reliable scientific, technical or other specialized information." A review of the transcript reveals that the coroner's testimony was responsive to the prosecutor's specific question and was not objectionable. After the coroner testified in detail as to the condition of the body as she found it when she arrived at the scene, the prosecutor asked:
 {¶ 53} "Q. Based upon what you saw with respect to the skin slippage, were you able to make a determination to a reasonable degree of scientific certainty and medical certainty and based upon your knowledge, training and experience as a forensic pathologist regarding the general time of death of Cori Key?
 {¶ 54} "A. Well, no, you could never do that to any great scientific certainty. There is a range of time in which the death could have occurred or could not have occurred. But to narrow it down scientifically, no, that's not possible."
 {¶ 55} The coroner explained why she was not able to point to a specific time of death to any degree of scientific certainty. She had already testified as to the "skin slippage" she observed, the heat in the bathroom, the state of decomposition, and her knowledge that the body had been left under the running shower for an extended period *Page 20 
of time. As a result, she responded with a general range, based upon her examination of the body and, of course, based upon her experience as an expert in the field of forensic pathology. This argument is without merit.
 {¶ 56} Next, appellant asserts that counsel should have pursued the exculpatory value of the phone records which the state submitted into evidence. Appellant asserts that counsel should have argued to the jury that the many calls made to Key's phones infer that he did not know she was dead and therefore was not the murderer. The record reflects, however, that during cross-examination of Sergeant Forrester, defense counsel raised the possibility that the phone calls from appellant's business might not have been made by appellant; Forrester agreed, stating that the phone records only indicate that a call was made, not who made the call. In that way, any uncertainty as to who made the calls was brought to the jury's attention. Counsel's decision not to place any additional emphasis on the phone records by arguing that appellant could have kept calling because he did not know Key had been killed was ultimately a matter of trial strategy and is not for this court to second-guess.
 {¶ 57} Third, appellant asserts that counsel should have moved to strike Hodrick's testimony that Key told her a neighbor saw appellant break into Key's house. As stated under our analysis of appellant's first assignment of error, Hodrick's testimony was admissible as an excited utterance; therefore, counsel was not ineffective for failing to object. *Page 21 
 {¶ 58} Finally, appellant asserts trial counsel was ineffective for failing to object to instances of prosecutorial misconduct. Having found appellant's claims of prosecutorial misconduct to be not well-taken, we must find that this argument has no merit.
 {¶ 59} Based on the foregoing, we find that appellant has not shown that counsel's representation fell below an objective standard of reasonableness or that there is a reasonable probability that, but for counsel's perceived errors, the results of the proceeding would have been different. Accordingly, appellant's sixth assignment of error is not well-taken.
 {¶ 60} In his seventh assignment of error, appellant asserts that, even if this court determines that there was sufficient evidence for a conviction, we should consider the cumulative effect of any harmless error found to have occurred, which may have deprived him of a fair trial. Because we have found that no prejudicial errors occurred in the trial of this case, there can be no cumulative error. Accordingly, appellant's seventh assignment of error is not well-taken.
 {¶ 61} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the cost of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 22 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Arlene Singer, J., William J. Skow, P.J., Thomas J. Osowik, J., CONCUR. *Page 1