**The STATE of Ohio, Appellee,**

v.

**BOLES, Appellant.**

[Cite as *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–09–1285.

Decided Nov. 12, 2010.

432

**436**

Julia R. Bates, Lucas County Prosecuting Attorney, and Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Jeffrey M. Gamso and Jeffrey J. Helmick, for appellant.

Osowik, Presiding Judge.

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas that found appellant guilty of one count of murder in violation of R.C. 2903.02(A) and 2929.02. For the following reasons, the judgment of the trial court is affirmed.

{¶ 2} This court affirmed appellant's conviction by decision and judgment filed on February 6, 2009. *State v. Boles*, 6th Dist. No. L–07–1255, 2009-Ohio-512, 2009 WL 282720.[1] In May 2009, appellant filed a timely application to reopen his appeal pursuant to App.R. 26(B). Additionally, appellant filed a motion to vacate this court's February 6, 2009 decision and remand the case to the trial court for entry of a final, appealable order pursuant to Crim.R. 32(C) and *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163.

---

1. In March 2010, the Supreme Court of Ohio declined to accept the case for review. *State v. Boles*, 124 Ohio St.3d 1494, 2010-Ohio-670, 922 N.E.2d 228.

{¶ 3} On September 14, 2009, this court denied the motion to vacate but granted the motion to remand to the trial court to issue a final, appealable order. The trial court issued a final, appealable order on October 9, 2009. By order filed October 27, 2009, this court determined that it did not have jurisdiction over appellant's appeal filed July 30, 2007, denied his application to reopen, and granted appellant leave to file a new notice of appeal from the October 9, 2009 judgment of conviction.

{¶ 4} On November 4, 2009, appellant filed a new notice of appeal, which is now before this court.

{¶ 5} Appellant sets forth nine assignments of error:

{¶ 6} "Assignment of Error No. 1

{¶ 7} "The trial court's improper admission of hearsay evidence denied Mr. Boles his right to a fair trial.

{¶ 8} "Assignment of Error No. 2

{¶ 9} "The improper opinion testimony and argument by state witness Det. Forrester deprived Mr. Boles of his right to a fair trial.

{¶ 10} "Assignment of Error No. 3

{¶ 11} "Prosecutorial misconduct during opening statement and rebuttal closing argument deprived Mr. Boles of his right to a fair trial.

{¶ 12} "Assignment of Error No. 4

{¶ 13} "The court's improper jury instruction telling the jury their job was to determine Boles' 'guilt or innocence' violated Boles' right to a fair trial.

{¶ 14} "Assignment of Error No. 5

{¶ 15} "Boles' trial counsel provided ineffective assistance of counsel when they

{¶ 16} "1. Failed to object to the venire after the only African–American juror was excused;

{¶ 17} "2. Failed to object to the coroner's testimony regarding time of death;

{¶ 18} "3. Failed to object to prosecutorial misconduct;

{¶ 19} "4. Failed to object to hearsay testimony;

{¶ 20} "5. Failed to object to improper jury instruction regarding the jury's role.

{¶ 21} "Assignment of Error No. 6

{¶ 22} "The trial court's improper limiting of defense counsels' cross-examination of state witnesses deprived Mr. Boles of his right to a fair trial.

{¶ 23} "Assignment of Error No. 7

{¶ 24} "Cumulative error requires a new trial.

{¶ 25} "Assignment of Error No. 8

{¶ 26} "There was insufficient evidence to support the verdict of guilty of murder.

{¶ 27} "Assignment of Error No. 9

{¶ 28} "The jury's verdict is not supported by the manifest weight of the evidence."

{¶ 29} The undisputed facts relevant to the issues raised on appeal are as follows. Cori Key was murdered in Toledo, Ohio, sometime after 12:00 a.m. on July 31, 2004. Her body was found in her home by her father in the early evening hours of July 31; she had been stabbed twice, once through the heart. Appellant, who was Key's boyfriend and the father of one of her children, was identified as a suspect. Appellant submitted to a police interview in the hours immediately following the murder, but he was not charged with the crime, and the case went cold for more than two years. The case eventually was reopened, and in December 2006, appellant was indicted for Key's murder. Appellant entered a plea of not guilty and was tried by a jury. A verdict of guilty was returned on July 19, 2007, and the trial court imposed a sentence of 15 years to life.

{¶ 30} In support of his first assignment of error, appellant asserts that the trial court improperly allowed into evidence two hearsay statements. The first statement that appellant challenges was made by Key's friend and neighbor, Rubin Smith, who testified that Key told him that appellant said he would kill her. According to Smith's testimony, Key came to him while she was talking to appellant on her cell phone and, while still on the phone, asked Smith to tell her father that appellant was talking about killing her. Smith testified: "She asked me I appreciate it if you tell my father something because something bad going to happen, and then I asked her what. She said, well, my boyfriend, he was talking about killing me." Over appellant's objection, the trial court admitted the statement based on the "state of mind" exception to hearsay under Evid.R. 803(3).

{¶ 31} Appellant argues that the statement should not have been admitted under the state-of-mind exception to the hearsay rule. For the reasons set forth below, this court finds that Smith's statement was properly admitted as an exception to hearsay, although it should have been admitted as an excited utterance pursuant to Evid.R. 803(2).

{¶ 32} A statement other than one made by the declarant, offered in evidence to prove the matter asserted, is hearsay pursuant to Evid.R. 801(C) and

is generally inadmissible. Evid.R. 802. There are numerous exceptions to the rule, however, as set forth in Evid.R. 803 and 804. As with other evidentiary rulings, the determination whether hearsay statements are subject to exception rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 92. An abuse of discretion is more than an error in judgment or a mistake of law; it connotes that the court's attitude is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

{¶ 33} Evid.R. 803(2) provides an exception to the rule excluding hearsay if the out-of-court statement was an excited utterance—that is, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 34} In *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, the Ohio Supreme Court established a four-part test to determine whether a hearsay statement is admissible under Evid.R. 803(2). Id. at paragraph one of the syllabus, approving and following *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus. Under this test, the proponent of the statement must establish that (1) there was an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have had an opportunity to personally observe the startling event. Id.

{¶ 35} In this case, we find that Key's experience of hearing appellant threaten to kill her was startling enough to cause her to go immediately to Smith and relay the information to him. She was still under the "nervous excitement" created by the threats when she spoke to Smith because she was still on the phone with appellant, and what she communicated to Smith clearly related to the startling event. Finally, Key clearly had an "opportunity to observe personally the matters asserted" in her statement by virtue of hearing appellant's threatening words over the phone.

{¶ 36} Based on the foregoing, we conclude that the trial court properly ruled that Smith's statement was admissible as a hearsay exception, although we find that the statement qualifies as an excited utterance under Evid.R. 803(2) rather than as a state-of-mind exception. We are able to come to this resolution based on the decision in *State v. Peagler* (1996), 76 Ohio St.3d 496, 501, 668 N.E.2d 489, which holds that an appellate court may decide an issue on grounds different from those determined by the trial court, so long as the evidentiary basis on which the appellate court decides a legal issue was adduced before the trial court

and made a part of the record thereof. The record in this case satisfies the standard required by *Peagler*. We therefore find that appellant's first argument under his first assignment of error is without merit.

▮ {¶ 37} In his second argument in support of his claim that the trial court improperly admitted hearsay statements, appellant cites the testimony of Satyra Hodrick that Key told her that a neighbor, Sevequa Glenn, said she saw appellant break into Key's house that evening. Key had been gone for several hours during the evening having dinner with Hodrick and some other friends. Appellant asserts that Hodrick's testimony constitutes inadmissible double hearsay.

{¶ 38} Pursuant to Evid.R. 805, hearsay within hearsay is admissible if each part of the combined statements conforms to an exception to the hearsay rule. Therefore, in order for Hodrick's statement to be admissible, Glenn's statement to Key, and Key's subsequent statement to Hodrick, must both fall under an exception to the hearsay rule.

{¶ 39} The admissibility of this testimony was addressed in a side-bar discussion prior to Hodrick's testimony. At that time, the trial court ruled that Glenn's telling Key about the break-in when Key returned from dinner and Key's call to Hodrick after she talked to Glenn both were excited utterances. After the trial court's ruling, Hodrick testified that Key called her shortly before midnight on the night of her death and told Hodrick that her neighbor had said that appellant had broken into her house while Key and Hodrick were out to dinner. Hodrick testified that Key was upset when she called.

{¶ 40} As explained above, in order for testimony to be admissible under Evid.R. 803(2) as an "excited utterance," there must be a startling occurrence sufficient to still the reflective faculties of the declarant and a statement made nearly contemporaneously with the startling event that relates to that event and concerns things that the declarant had an opportunity to personally observe. *State v. Wallace* (1988), 37 Ohio St.3d 87, 89, 524 N.E.2d 466.

▮ {¶ 41} As to the statement Glenn made to Key, Glenn's testimony that she saw appellant "messing" with one of Key's downstairs windows for about 30 minutes would be a startling event for most people. It clearly bothered Glenn enough to take the initiative to tell Key when she saw Key return home that night. Further, we note that there is no specific amount of time after which a statement can no longer be considered an excited utterance; the statement simply may not be the result of reflective thought. *State v. Hoehn*, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, 2004 WL 573844, ¶ 14, citing *State v. Taylor* (1993), 66 Ohio St.3d 295, 300–301, 612 N.E.2d 316. Our review of the record fails to reveal any testimony to indicate that Glenn's statement was the result of

reflective thought. Finally, Glenn's statement was directly related to her personal observation of appellant's conduct.

{¶ 42} Upon review of the foregoing, we find that the trial court did not abuse its discretion by allowing Glenn's statement as an excited utterance.

{¶ 43} As to Key's statement to Hodrick, we find that the statement also was properly admitted as an excited utterance. Hodrick testified that Key told her that a neighbor had said that appellant had broken into her home through one of the windows. Hodrick indicated that Key had been upset to learn what her neighbor had seen. The record indicates that Key's statement to Hodrick was made nearly contemporaneously with her being told by Glenn that appellant had broken into the home. There is no indication that Key's statement to Hodrick was the result of reflective thought; it appears that Key was startled to have learned about what had occurred. The trial court clearly determined that Hodrick's testimony that Key had been upset after hearing what had happened at her house that evening qualified as an excited utterance. We find that the trial court, after hearing Hodrick's testimony, was in the best position to make a determination whether Key's statement was an excited utterance.

{¶ 44} Based on the foregoing, we find that the trial court did not abuse its discretion by allowing the disputed testimony as exceptions to the hearsay rule, and accordingly, appellant's first assignment of error is not well taken.

■■ {¶ 45} As his second assignment of error, appellant asserts that the trial court improperly admitted the testimony of Detective Forrester, which appellant claims was improperly argumentive and constituted closing argument rather than evidence. Appellant cites the detective's testimony as to appellant's phone records the night Key was murdered, arguing that the analysis of the records was argumentive and outrageous. In his testimony, Forrester commented on inconsistencies between statements made by appellant when questioned by the police and facts as shown by appellant's phone records. Appellant argues that the testimony amounted to improperly admitted opinion that appellant lied on several occasions about his whereabouts during the time surrounding the murder.

{¶ 46} Evid.R. 701 provides that when a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences that are (1) rationally based on the witness's perception and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. *State v. Bleigh*, 5th Dist. No. 09–CAA–03–0031, 2010-Ohio-1182, 2010 WL 1076253, ¶ 106.

{¶ 47} The record before us reflects that Forrester testified as to his investigation of the case, which involved interviews with appellant. Forrester further

testified about inconsistencies between appellant's statements concerning his whereabouts during the murder and the evidence derived from appellant's cell-phone records. The detective's perception of appellant's demeanor during interviews and the statements appellant made were helpful to the jury's understanding of the significance of the phone records. We therefore find that Forrester's testimony was proper lay-opinion testimony under Evid.R. 701 and was rationally related to his review of the phone records and the statements appellant made to the police. We further find that Forrester's testimony is improperly characterized as argumentative by appellant.

{¶ 48} Based on the foregoing, appellant's second assignment of error is not well taken.

{¶ 49} In his third assignment of error, appellant asserts that prosecutorial misconduct during opening statement and rebuttal closing argument deprived him of his right to a fair trial.

{¶ 50} The Supreme Court of Ohio has held that counsel's misconduct "must be considered in the light of the whole case." *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768. Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. *State v. Ballew* (1996), 76 Ohio St.3d 244, 667 N.E.2d 369. In closing arguments, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *State v. Stevens*, 2d Dist. No. 19572, 2003-Ohio-6249, 2003 WL 22764527, ¶ 34. Accordingly, a reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct. *State v. Smith* (1984), 14 Ohio St.3d 13, 15, 14 OBR 317, 470 N.E.2d 883.

{¶ 51} In the case before us, because defense counsel failed to object to any of the statements made by the prosecutor, our review of the alleged improper statements is discretionary and limited to plain error only. Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the trial court." However, this court has held that "notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. In order to prevail on a claim governed by the plain error standard, appellant must demonstrate that the outcome of his trial would clearly have been different but for the errors he alleges." (Citations omitted.) *State v. Jones*, 6th Dist. No. L–05–1101, 2006-Ohio-2351, 2006 WL 1305097, ¶ 72.

{¶ 52} First, appellant argues that during opening statement, the prosecutor told the jurors that they would hear testimony describing how Boles broke into Key's house on the night of the murder and was later seen running out of her house. Appellant asserts that there was no such testimony. Appellant also argues that during rebuttal closing argument, the prosecutor told the jury that appellant had tried to rape Key on the night she was murdered. Finally, appellant argues that the prosecutor improperly vouched for the credibility of Jeannine Lamb and Rubin Smith when he stated, "We would submit to you [Lamb is] stone cold sober when she hears that from him, and the same thing with Rubin." The prosecutor was referring Lamb's and Rubin's testimony that appellant threatened them with harm if they told anyone what they had seen the night of the murder.

{¶ 53} This court has reviewed the state's rebuttal closing argument in its entirety. We have also considered the prosecutor's statements in the context of all the evidence presented at trial. Upon consideration thereof and the law, we find that the trial court did not commit plain error by allowing the jury to hear the prosecutor's statements without objection and, further, that appellant has not demonstrated that the outcome of his trial would clearly have been different but for the prosecutor's statements. Accordingly, we find appellant's third assignment of error not well taken.

{¶ 54} In support of his fourth assignment of error, appellant asserts that the trial court improperly instructed the members of the jury that it was up to them to determine appellant's "guilt or innocence." Appellant emphasizes that it is the role of the jury to determine whether the state has proven each and every element of the offense beyond a reasonable doubt.

{¶ 55} Again, we note that trial counsel did not object to the contested language. Therefore, the trial court's statement will be reviewed under the plain-error standard as set forth above.

{¶ 56} This court has reviewed the trial court's instructions to the jury in its entirety. The statement in question was made right after the trial court instructed the jury as to numerous matters, including its job of determining whether the state proved beyond a reasonable doubt all of the essential elements of the offense of murder. Immediately thereafter, the court stated: "You may not discuss or consider the subject of punishment. Your duty is confined to— your duty is confined to the determination of the guilt or innocence of the defendant. In the event you find the defendant guilty, the duty to determine the punishment is placed by law upon the Court." It is clear the statement was made as part of the trial court's admonition for the jury not to consider the subject of punishment during its deliberations.

{¶ 57} The Supreme Court of Ohio has addressed this issue, holding, "At most, the use of the phrase 'guilt or innocence' in this limited context relating to punishment is totally inconsequential." *State v. Coley* (2001), 93 Ohio St.3d 253, 267–268, 754 N.E.2d 1129. The trial court herein used language identical to that at issue in *Coley*. Additionally, we find that appellant has not shown that the outcome of his trial would clearly have been different but for the error he alleges. Accordingly, appellant's fourth assignment of error is not well taken.

{¶ 58} In support of his fifth assignment of error, appellant asserts that he was denied effective assistance of counsel in several respects. To prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result. This standard requires appellant to satisfy a two-pronged test. First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that but for counsel's perceived errors, the results of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. This test is applied in the context of Ohio law that states that a properly licensed attorney is presumed competent. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476.

{¶ 59} First, appellant asserts that trial counsel should have objected to the venire when the only African–American juror was excused. The record reflects that the juror in question informed the trial court that she did not want to judge another person and did not believe she could sit as a juror. After questioning the prospective juror at length and discussing the matter with counsel, the trial court excused her with the agreement of the prosecutor and defense counsel.

{¶ 60} The Sixth Amendment to the United States Constitution guarantees a defendant the right to have a jury drawn from a representative cross-section of the community. *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690; *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, fn. 1. In order to establish a violation of this right, the defendant must prove "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process. [Citation omitted.]" *Fulton*, paragraph two of the syllabus.

{¶ 61} Notably, appellant does not assert that Lucas County's system of jury selection systematically excluded African–Americans from his jury or that the

prosecutor, trial court, or defense counsel acted wrongly in determining that the juror should be excused. Instead, appellant argues that once the juror was excused, counsel should have asked the court to secure more jurors in order to ensure that appellant would have had a jury chosen from a venire that included members of his race.

{¶ 62} In light of the law as set forth above, we are unable to find that appellant has established a violation of his right as set forth in *Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195. Further, appellant has not shown that trial counsel's representation fell below an objective standard of reasonableness in this regard or that counsel's conduct deprived appellant of a fair trial. This argument is without merit.

{¶ 63} Next, appellant asserts that trial counsel should have objected when the coroner testified as to the victim's estimated time of death. Appellant argues that the coroner's opinion was not rendered "to any degree of scientific certainty, probability, or even possibility" and that it was not based upon any "reliable scientific, technical or other specialized information." A review of the transcript reveals that the coroner's testimony was responsive to the prosecutor's specific question and was not objectionable. After the coroner testified in detail as to the condition of the body as she found it when she arrived at the scene, the prosecutor asked:

{¶ 64} "Q. Based upon what you saw with respect to the skin slippage, were you able to make a determination to a reasonable degree of scientific certainty and medical certainty and based upon your knowledge, training and experience as a forensic pathologist regarding the general time of death of Cori Key?

{¶ 65} "A. Well, no, you could never do that to any great scientific certainty. There is a range of time in which the death could have occurred or could not have occurred. But to narrow it down scientifically, no, that's not possible."

{¶ 66} The coroner explained why she was not able to point to a specific time of death to any degree of scientific certainty. She had already testified as to the "skin slippage" she observed, the heat in the bathroom, the state of decomposition, and her knowledge that the body had been left under the running shower for an extended period of time. As a result, she responded with a general range, based upon her examination of the body and, of course, based upon her experience as an expert in the field of forensic pathology. This argument is without merit.

{¶ 67} Additionally, appellant asserts that trial counsel was ineffective for failing to object to instances of prosecutorial misconduct, failing to object to the testimony of Detective Forrester, and failing to object when the trial court referred to determining appellant's "guilt or innocence." Having found appel-

lant's claims as to those three issues not well taken under our analysis of Assignment of Error Nos. 2, 3 and 4, above, we find that this argument has no merit.

{¶ 68} Based on the foregoing, we find that appellant has not shown that counsel's representation fell below an objective standard of reasonableness or that there is a reasonable probability that but for counsel's perceived errors, the results of the trial would have been different. Accordingly, appellant's fifth assignment of error is not well taken.

{¶ 69} In his sixth assignment of error, appellant asserts that the trial court improperly limited the cross-examination of witness Jeannine Lamb by the defense, thereby violating appellant's Sixth Amendment right to confront witnesses against him. Appellant argues that counsel was attempting to impeach the testimony of Rubin Smith through its cross-examination of Lamb. Rubin Smith, Key's next-door neighbor, had testified as to his observations on the night of the murder. While cross-examining Smith as to what he saw while looking out his window on the night of the murder, defense counsel asked Smith whether he had been drinking or taking any substance "that would make it difficult for [him] to see anything." Smith responded that he had not. Later, while cross-examining Lamb, who lived with Smith at the time of the murder, defense counsel asked Lamb whether Smith had a drug habit. The state objected, and the trial court sustained the objection. The trial court explained that the attempt at impeachment was improper because Smith had already testified on that point and because Smith could not be cross-examined on Lamb's testimony as to his drug usage. Appellant now argues that Lamb's answer to the question regarding whether Smith had a drug habit would have been relevant to Smith's credibility.

{¶ 70} It is well settled that " '[t]he scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge.' " *State v. Lundgren* (1995), 73 Ohio St.3d 474, 487, 653 N.E.2d 304, quoting *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 407 N.E.2d 490. Thus, when the trial court allows or disallows certain testimony, the order or ruling of the court will not be reversed absent a clear and prejudicial abuse of discretion. *O'Brien* at 163.

{¶ 71} Counsel's attempt to question Lamb about Smith's drug use was intended to discredit Smith's character. However, pursuant to Evid.R. 608(B), specific instances of a witness's conduct, for the purpose of attacking or supporting his character for truthfulness (other than conviction of crime as provided in Evid.R. 609), may not be proven by extrinsic evidence such as Lamb's testimony.

{¶ 72} Defense counsel's proposed line of questioning would not have assisted the jury in evaluating Smith's credibility because Smith had already been asked

on cross-examination whether he had used any substances the night of the murder. Smith responded that he had not, and defense counsel did not pursue the matter. We are unable to find that the trial court's ruling limiting the cross-examination of Lamb as to Smith's possible drug use was unreasonable, arbitrary, or unconscionable. Accordingly, the trial court did not abuse its discretion, and appellant's sixth assignment of error is not well taken.

{¶ 73} In his seventh assignment of error, appellant asserts that even if this court determines that there was sufficient evidence for a conviction, we should consider the cumulative effect of any harmless error found to have occurred. Because we have found that no prejudicial errors occurred in the trial of this case, there can be no cumulative error. Accordingly, appellant's seventh assignment of error is not well taken.

{¶ 74} In his eighth assignment of error, appellant asserts that his conviction was not supported by sufficient evidence. As his ninth assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence. These arguments will be considered together, as both can be resolved by examining the evidence presented at trial.

{¶ 75} Sufficiency of the evidence is a question of law that asks whether the evidence is legally adequate to support a jury verdict on all elements of the crime. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. A conviction that is based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *Thompkins,* 78 Ohio St.3d at 386–387, 678 N.E.2d 541.

{¶ 76} In contrast, a manifest-weight challenge questions whether the state has met its burden of persuasion. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. In making this determination, the court of appeals sits as a "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 77} Appellant was convicted of murder in violation of R.C. 2903.02(A), which provides, "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."

{¶ 78} In support of his eighth and ninth assignments of error, appellant states that none of the witnesses were able to place appellant at the scene of the crime. Appellant's arguments essentially focus on the testimony of Key's neighbor, Rubin Smith, who said that he saw appellant leaving Key's house on the night of the murder, as unclear.

{¶ 79} The jury in this case heard extensive testimony on behalf of the state from 11 family members, friends, and acquaintances of the victim; the Lucas County deputy coroner; seven police officers; and two forensic scientists. The defense presented four witnesses, one of whom was a friend of appellant's and three of whom were employees of a bar where appellant was seen the night of the murder.

{¶ 80} Key's father testified that he discovered Key's body in the bathroom of her home at approximately 6 p.m. on July 31, 2004, and immediately called 911. Key's father also testified that when he was standing outside the house after the police arrived, appellant approached him and said that when the police tested Key's fingernails for DNA evidence, they would see that he did not murder her. Additionally, Key's friend, Cheri Thompson, testified that appellant went to see her the day after the murder and told her that the police would not find his DNA under Key's fingernails because he did not kill her. He also told Thompson that he would not have to break into Key's house because he had his own key. Thompson described Key and appellant's relationship as "abusive."

{¶ 81} Yvonne Booth testified that Key had had a manicure before they went out to dinner on July 30. When shown a photograph of Key's fingernails after the murder, Yvonne stated that Key's nails were a lot shorter in the photo and did not look the same as they had earlier in the evening. Kenneth Johnson testified that he was a nail technician and gave Key a manicure on July 28 or 29, 2004. When he was shown the photograph of Key's fingernails after her death, he stated that it did not depict his work and that he had never seen her with fingernails that short.

{¶ 82} Several police officers testified about the condition of the scene when they responded to the initial call from Key's father. The Lucas County deputy coroner testified about her examination of the body at the scene and during the autopsy. She stated that she was unable to find any DNA evidence under Key's fingernails.

{¶ 83} Several of Key's friends testified that they had gone out to dinner with Key on the evening of July 30, 2004. Satyra Hodrick testified that Key had

dropped her off at home around 10:00 p.m. At approximately 11:45, Key called Satyra and said that appellant had broken into her house. Key sounded upset, and Satyra told her to go somewhere else for the night. She did not hear from Key again.

{¶ 84} Key's friend, Teshauna Isaac, also testified that Key had called her shortly before midnight using another friend's phone and said that someone had pushed her window air conditioner in and had gone into her house; shampoo had been poured into her two house phones so that they would not work. Key told Teshauna that she was going back home to lock up and go to bed. Teshauna did not hear from her again. Teshauna testified that Key had been talking about breaking up with appellant for several months prior to the murder. Teshauna further testified that in April 2004, she took Key home after Key and appellant had an argument while the three of them were out at a local bar. When Teshauna returned to the bar after taking Key home, appellant told her he was going home "to beat his bitch ass." Teshauna left the bar later and went to Key's house. When she knocked on the door, appellant answered; he said he did not want any "bitches" calling the house and punched Teshauna in the face. Although Key and appellant still saw each other after that night, Key had made appellant move out of her house and had changed the locks. Teshauna considered appellant to be jealous and controlling and testified that Key was afraid of appellant. Key's friend Harriett Hardy also testified that she believed Key was afraid of appellant.

{¶ 85} Sevequa Glenn, Key's neighbor, testified that after dark on the night of the murder, she saw appellant, whom she knew was Key's boyfriend, drive up, park his car on the street, and walk to Key's house. Glenn saw appellant "mess with" one of the windows as if he were trying to open it. Glenn did not watch appellant continuously but saw him leave approximately 30 minutes later. As soon as appellant left, Glenn saw Key drive up. She crossed the street and told Key she had just seen appellant at her house.

{¶ 86} Rubin Smith, another of Key's neighbors, testified that he woke up in the middle of the night on July 31, 2004, and while he was looking out his kitchen window, he saw appellant leave Key's house and run to her garage. Smith stated that there is a light behind Key's house and that he had no doubt it was appellant he saw. Appellant was wearing jeans, a leather jacket, and gloves. Smith saw appellant back out of Key's garage on his motorcycle and slowly drive away. Smith further testified that the following afternoon, when he was standing outside with other onlookers after the police arrived, appellant approached him and asked whether he had heard or seen anything; Smith said he had not. Appellant then told Smith that if he said anything to the police "something bad was going to happen." Smith later told a detective what appellant had said.

{¶ 87} Sergeant Tim Campbell, who interviewed appellant after investigating the crime scene, testified that appellant had "fresh scratches" on his stomach and back. Appellant told him he was scratched the night before while shadowboxing with a friend. He told Campbell that he had his shirt on while shadowboxing.

{¶ 88} Jeannine Lamb testified that she lived next door to Key and that on the night of the murder, she heard a motorcycle directly outside at approximately 3:00 a.m. but did not see who was driving it. She further testified that appellant later "confronted" her and said, "[H]e knows where [she] stayed at," which frightened her. Appellant then told her that if she told anybody what she knew, "something would happen to" her.

{¶ 89} Toledo Police Sergeant Steve Forrester, supervisor of the cold-case unit, testified that the unit decided to reopen Key's murder case in 2006 upon the request of the original detective. Forrester testified that the unit examined phone records from three of appellant's phones and two of Key's phones prior to the murder and compared them to the statements appellant gave the police at that time. The detectives concluded that based on those comparisons, statements appellant gave during his interview with the original detective in 2004 could not have been true. In support of that conclusion, while acknowledging that the phone records cannot identify the individual making the calls, Forrester provided the following information. Between 4:26 p.m. and 9:15 p.m. on the evening of the murder, appellant placed 54 calls to Key. Also, during a one-hour period that evening—when appellant had told detectives that Key was with him at work—phone records showed outgoing calls from Key's home phone, one of which was to appellant's cell phone. There also was an outgoing call from appellant's business phone to Key's home phone during that time. Additionally, although appellant told the police that he went to Key's house between 9:00 p.m. and 10:00 p.m. that evening looking for her, the records showed 16 calls from his business phone during that time frame. Lastly, despite having told police he was at the bar from 10:00 p.m. until 1:00 a.m. that night, the phone records show at least nine calls made from appellant's business shortly after 10:00 p.m. Nine more were made shortly after midnight, also from his business. In all, between 10:06 a.m. on July 30, 2004, and 2:39 a.m. on July 31, 2004, a total of 93 calls were made from appellant's business and cell phones to Key's phones; 24 of those calls were made between 12:01 a.m. and 12:58 a.m. on July 31.

{¶ 90} Forrester also testified to other inconsistencies between appellant's statements to police the day of the murder and his statements to the detective when the case was reopened. Those statements concerned such issues as appellant's and Key's whereabouts on the evening of the murder, whether or not appellant knew that Key was going out to dinner with friends that evening, and whether he and Key were planning to get married in two weeks. Forrester also

noted inconsistencies in appellant's statements regarding whether he was bothered by Key's going out to dinner with her friends, whether he was angry that she did not answer his calls that evening, whether he was concerned about her plans to leave town with friends that weekend, and whether the scratches on his chest happened while "play fighting" with a friend or during sex with Key the night before the murder.

{¶ 91} The defense presented testimony from the bouncer at the bar the night of the murder, who recalled appellant being there for a while but did not know what time appellant arrived or when he left. In contrast to appellant's original statement to police that scratches on his chest were the result of horseplay at the bar, the bouncer denied seeing appellant or anyone else "play fighting" enough to get scratched. The manager of the bar and the bar's owner both also confirmed that appellant was there but could not confirm exactly when appellant left.

{¶ 92} This court has thoroughly considered the entire record of proceedings in the trial court and the testimony as summarized above and finds that the state presented sufficient evidence from which, when viewed in a light most favorable to the state, a rational trier of fact could have found appellant guilty beyond a reasonable doubt of murder in violation of R.C. 2903.02(A). See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, syllabus.

{¶ 93} As this court has consistently affirmed, the trier of fact is vested with the discretion to weigh and evaluate the credibility of conflicting evidence in reaching its determination. It is not within the proper scope of the appellate court's responsibility to judge witness credibility. *State v. Hill,* 6th Dist. No. OT–04–035, 2005-Ohio-5028, 2005 WL 2334701, ¶ 42. Further, based on the testimony summarized above and the law, this court cannot say that the jury clearly lost its way or created a manifest miscarriage of justice by finding appellant guilty of the charge of murder. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Accordingly, we find that appellant's eighth and ninth assignments of error are not well taken.

{¶ 94} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the cost of this appeal pursuant to App.R. 24.

Judgment affirmed.

SINGER and COSME, JJ., concur.