[Cite as *State v. Wagner*, 2015-Ohio-5502.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No. E-14-098

      Appellee                          Trial Court No. 2013-CR-164

v.

Joseph D. Wagner, Sr.                     **DECISION AND JUDGMENT**

      Appellant                         Decided:  December 30, 2015

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Mary Ann Barylski, Chief Assistant Prosecuting Attorney,
for appellee.

John A. Coble and Joseph F. Albrechta, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Defendant-appellant, Joseph D. Wagner, Sr., appeals the June 25, 2014

judgment of the Erie County Court of Common Pleas.  For the reasons that follow, we

affirm, in part, and reverse, in part, as to Wagner's sixth assignment of error, but affirm

as to all other assignments of error.

## I. Background

{¶ 2} In February of 2013, ten-year-old L.M. and seven-year-old J.M. reported to their mother, T.M., that their grandfather, Joseph D. Wagner, Sr., had been inappropriately touching them over an approximately three-year period. On April 10, 2013, Wagner was indicted on 10 counts of rape, violations of R.C. 2907.02(A)(1)(b). As to all counts, Wagner was alleged to have purposely compelled the victims to submit to sexual conduct by force or threat of force, and as to all counts except Count 5, the victims were alleged to have been under the age of ten.

{¶ 3} Following seven days of trial, an Erie County jury convicted Wagner of all counts. On June 23, 2014, the trial court sentenced Wagner to 11 years' imprisonment on Count 5 and life imprisonment without parole on the nine remaining counts. He was classified a Tier III sexual offender, and was ordered to pay restitution of $5,975.52 to compensate the victims' family for L.M., J.M., and T.M.'s out-of-pocket counseling expenses, and for time missed at work by T.M. and the children's father, M.M.

{¶ 4} Wagner now appeals his conviction, a number of the trial court's evidentiary rulings, and the restitution order. He assigns the following errors for our review:

> Assignment of Error No. 1:
>
> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FINDING ALLEGED VICTIM J.M. COMPETENT TO TESTIFY.

2.

Assignment of Error No. 2:

THE TRIAL COURT ERRED BY ADMITTING HEARSAY STATEMENTS WHICH CAUSED DEFENDANT IRREPARABLE PREJUDICE.

Assignment of Error No. 3:

THE CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

Assignment of Error No. 4:

PROSECUTORIAL MISCONDUCT DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL.

Assignment of Error No. 5:

CUMULATIVE ERROR DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL.

Assignment of Error No. 6:

THE TRIAL COURT ERRED IN IMPOSING RESTITUTION.

{¶ 5} We address each of these assignments of error, but we discuss Wagner's third and fourth assignments of error out of order.

3.

## II. Law and Analysis

### A. Competency

{¶ 6} In his first assignment of error, Wagner claims that the trial court erred in concluding that J.M., who was seven years old at the time of trial, was competent to testify. He concedes that he failed to object in the trial court to the court's competency determination, and that we are limited to a plain-error review.

{¶ 7} Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.*, citing *Long* at paragraph two of the syllabus.

{¶ 8} Under Evid.R. 601(A), every person is competent to be a witness except "children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." It is well-settled that the trial judge must make preliminary determinations as to the competency of all witnesses, including children. *State v. Clark*, 71 Ohio St.3d 466, 469-70, 644 N.E.2d 331 (1994). He or she must conduct a voir dire examination of a child under ten years old to determine whether he or she is competent to testify. *State v.*

4.

*Frazier*, 61 Ohio St.3d 247, 250-51, 574 N.E.2d 483 (1991). In making that determination, the court must consider "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *Id.* Because the trial judge has the opportunity to see the child and hear the child's testimony, he or she is in the best position to judge the child's competency. *Id.*

{¶ 9} Wagner contends that the trial court failed to consider all required factors in determining J.M.'s competency. In support of this contention, he complains that much of J.M.'s testimony was non-verbal or mono-syllabic, and he points to the following examples purportedly calling into question her recollection and appreciation for her responsibility to tell the truth: (1) she could not remember her birth year or her most recent birthday presents other than clothes; (2) she could recall only one of her Christmas presents; (3) she responded "no" when the trial judge told her that he was 53 years old and asked her if that was old; (4) she said her mother would ground her if she lied, but also said that she was told she would get ice cream after testifying; (5) when asked who her grandpa was, she answered "um, the one that did the bad thing"; and (6) when the trial judge asked her how it would make her feel for her grandfather to be present at trial, she responded that her mother would not want her near him. Wagner says that several of

5.

J.M.'s responses raised the possibility of parental management of her testimony and required further inquiry.

{¶ 10} While it is true that many of the trial court's questions to J.M. were pointed questions calling for a one-word response, J.M. provided details when appropriate. When asked to describe what "the truth" is, she responded: "what actually happened." She described a lie as "making up a story and then just like telling it." She talked about what the consequences of telling a lie would be, both at home and at school. She said that at home, she would get grounded for telling lies and that part of her punishment would include having her electronics taken away. She described the disciplinary system used by her teacher and the penalty she would expect for telling a lie at school. These responses exhibited that J.M. understood truth and falsity and her obligation to be truthful.

{¶ 11} To ascertain whether J.M. could differentiate the truth from a lie, the court made a number of specific objective statements and asked her to tell him whether the statements were true or whether they were lies: my robe is purple; the sun is shining; we are at Cedar Point; your birthday is July 4; your name is Elizabeth. J.M. answered appropriately.

{¶ 12} In addition to demonstrating that she understood truth from falsity and her obligation to be honest, J.M. also demonstrated an ability to recollect impressions and observations and to communicate what she observed. She engaged in dialogue with the judge and court staff. She named her school, her teachers, her favorite school subjects, and her friends. She recalled that her sister got headphones and an American Girl doll for

6.

Christmas and music gift cards for her birthday. She told the trial judge that she is saving her money to buy an iPod and she informed him that an iPod costs $200. When the trial judge told her that the court reporter and her children had gone to the same school J.M. attends, J.M. asked the court reporter if the school had computers when she went there and asked the names of her children.

{¶ 13} As the hearing wound down, the court asked J.M. if she had any questions. She asked how many times she would have to come to court and whether her mom and her grandfather would be there. The judge asked her if she got to miss school to come to court. J.M. said yes and told the judge that her mom was going to take her out for ice cream when she was finished. The statement was completely unrelated to the questioning about what was a truth versus what was a lie. We see nothing sinister in her mother's promise to take her for ice cream as a reward for enduring the experience of testifying. We do not interpret it as an incentive to be untruthful or as evidence of "parental management." We also find nothing unusual in J.M. describing her grandfather as "the one who did the bad things," or expressing concern about how her mother would feel about being in the courtroom with him.

{¶ 14} We find Wagner's first assignment of error not well-taken.

### B. Hearsay

{¶ 15} At trial, both L.M. and J.M. testified. So did a number of individuals who tended to them after the abuse was reported, including Rebecca Boger, an intake investigator in the Children's Services Division of the Ohio Department of Job and

7.

Family Services ("ODJFS"); Jacqueline Spadaro, a mental health therapist at Bayshore Counseling Services, who counseled L.M.; Rebecca Dills, a mental health therapist at Bayshore Counseling Services, who counseled J.M.; Melinda Kuebler, a sexual assault nurse examiner ("SANE") who examined L.M. and J.M.; and Corey Mook, an officer with the Sandusky police department. The girls' parents also testified. Some of these witnesses testified about statements the victims made to them.

{¶ 16} In his opening brief, Wagner argues that the trial court improperly allowed these witnesses to testify as to out-of-court statements made by L.M. and J.M., in violation of Evid.R. 807. He claims that the state was required to provide ten days' notice of its intent to use these hearsay statements, but failed to do so.

{¶ 17} The state responds that Evid.R. 807 is inapplicable where, as here, the child victim testifies at trial. The state argues that "the victims' out-of-court statements were not hearsay" because they "testified prior to any other witnesses testifying and were, therefore, subject to cross-examination." It also argues that the statements were properly admitted under Evid.R. 803(4) as statements made for the purpose of medical diagnosis or treatment.

{¶ 18} In his reply brief, Wagner maintains that both the court and the state have confused the protections of the confrontation clause with the evidentiary rules addressing hearsay. He also submits that while some of the victims' statements may have been admissible under Evid.R. 803(4), many of their statements were not. To that end, Wagner contends that Boger should not have been able to testify about the girls' out-of-

8.

court statements at all because her role in interviewing them was entirely forensic in nature.

{¶ 19} A trial court has broad discretion concerning the admission of evidence and its rulings on such matters will not be disturbed absent an abuse of discretion. *State v. Valsadi*, 6th Dist. Wood No. WD-09-064, 2010-Ohio-5030, ¶ 40. An abuse of discretion is more than an error in judgment or mistake of law. "Abuse of discretion" connotes that the court's attitude is arbitrary, unreasonable or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 20} We first address Wagner's argument that the admission of the children's out-of-court statements violated Evid.R. 807(A)(4) because the state failed to give ten days' notice of its intent to use such statements. We observed in *State v. Lugli*, 6th Dist. No. Erie No. E-95-025, 1996 WL 493178, *8 (Aug. 30, 1996) that where a child is "found to be competent to testify and did testify at the trial below * * *, Evid.R. 807 does not control the admissibility of the evidence at issue." *Id.*, citing Evid.R. 807(A)(2). Evid.R. 807 is inapplicable here because both children testified.

{¶ 21} The state makes clear, however, that it did not rely on Evid.R. 807 in introducing the victims' out-of-court statements. Instead, it claims that the statements were admissible because "the victims testified prior to any other witnesses testifying and were, therefore, subject to cross-examination as to any statements that the victims made, which statements were provided in discovery. Therefore, any testimony, raised by appellant, as to the victims' out-of-court statements were not hearsay." The trial court

9.

apparently took the same position at trial, as evidenced by the following exchange that occurred in response to a hearsay objection:

>Court:  How is that hearsay?
>
>Ms. Barylski:  It's an out-of-court statement.
>
>Court:  But the witness has testified.
>
>Ms. Barylski:  Yeah, but it's still hearsay.  It's an out-of-court statement.
>
>Court:  But I think an out-of-court statement, as long as the witness has testified, I think it takes it out of the hearsay.
>
>* * *

{¶ 22} Interestingly, at trial, it was the state that objected and sought to exclude testimony elicited by Wagner about the victims' statements.  On appeal, the parties' positions have reversed.

{¶ 23} The Sixth Amendment's Confrontation Clause provides to an accused the right to be confronted with the witnesses against him.  *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  Section 10, Article I of the Ohio Constitution provides similar rights.  *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990).  In *Crawford*, the U.S. Supreme Court considered whether the introduction of a hearsay statement violated a defendant's right to confront the witnesses against him.  It held that the admission of out-of-court statements violates the Sixth Amendment

10.

when the statements "are testimonial and the defendant has had no opportunity to cross-examine the declarant." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 13, citing *Crawford* at 68. Many cases since *Crawford* have examined when statements are "testimonial."

{¶ 24} While confrontation clause violations are avoided when the declarant is able to be cross-examined at trial, as was the case with both L.M. and J.M., it does not follow that an out-of-court statement is not hearsay simply because the declarant has testified at trial. *See State v. Sheppard*, 164 Ohio App.3d 372, 2005-Ohio-6065, 842 N.E.2d 561, ¶ 31 (5th Dist.), quoting *Crawford* at 59, fn. 9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). Hearsay, by definition, is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Its admission is generally barred unless it falls within an exception set forth in Evid.R. 803, 804, or 807. The exceptions in Evid.R. 804 and 807 apply only where the declarant is unavailable to testify at trial. Because both victims testified at trial, neither of those rules provides a basis for admitting their out-of-court statements. We must determine, therefore, whether the victims' out-of-court statements were properly admitted under one of the Evid.R. 803 exclusions. The state contends that the statements were admissible under Evid.R. 803(4).

11.

**{¶ 25}** Evid.R. 803(4) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**{¶ 26}** We examine the witnesses' testimony and the statements at issue to determine whether they were admissible under Evid.R. 803(4) or any other exclusion.

### 1. Rebecca Boger

**{¶ 27}** Boger testified that as an intake investigator, her job is to investigate allegations of abuse or neglect, to ensure that the child is safe, and then to refer the family for any services they may need. Boger interviewed L.M. and J.M. at Michael's House on February 13, 2013. Michael's House is a child advocacy center that was developed in 2005. Boger described it as a neutral, comfortable place to interview children "so they don't have to go to the police department or to our agency." Michael's House has audio and video recording capabilities. Boger recorded her interviews of L.M. and J.M.

**{¶ 28}** Boger characterized her interview of L.M. and J.M. as "forensic." She testified that she conducts her interviews in accordance with Beyond the Silence protocol developed by the state of Ohio. She said that she was trained not to use suggestive

12.

techniques or to ask leading questions and that she tries to get correct information in as non-traumatic a way as possible. Boger explained that she receives a case when someone calls the agency with a concern. What she does next is determined on a case-by-case basis. With some children, the child is at immediate risk of harm and it is her job to make sure that the child is safe from the perpetrator. Once she deems that the child is safe, if it is a criminal matter, her job is to contact law enforcement so they can assist in the case.

{¶ 29} Boger interviewed L.M. and J.M. separately with no one else present in the room. Before the interview, Boger had been told that there were allegations of inappropriate touching, but she said that the girls disclosed "much, much more than that" and that the girls' parents had not known the extent of what was revealed during their interviews. Boger referred the family to the NORD Center in Lorain so the girls could be examined by a SANE nurse.

{¶ 30} Boger responded to questions on cross-examination about the difference between a forensic interview and a therapeutic interview. She agreed that in a forensic interview, she tries to obtain as much information as she can about what may have occurred, and she attempts to do so in a neutral manner without influencing the statement. In a therapeutic interview, the interviewer takes the position that what has been reported is true and works to treat the patient.

{¶ 31} On cross-examination, defense counsel asked Boger specific questions about what L.M. and J.M. told her. In response to these questions, Boger testified that

13.

J.M. told her that Wagner scratched her, that J.M. didn't talk to L.M. about what happened, that Wagner made her bleed, that Wagner abused her every time she went over to his house, and that Wagner told her not to tell anyone but she told because she wanted to make the right choice. Defense counsel elicited from Boger that L.M. never told her she had been forced to perform oral sex or that Wagner had stuck his finger inside of her. She confirmed that L.M. had told her that Wagner stuck his penis inside of her, that it happened every time she stayed the night at her grandparents' house except for the last time, and that when it happened, Wagner was on top of her.

{¶ 32} Wagner claims that Boger should not have been permitted to testify as to the girls' statements because she interviewed the children for forensic or investigative purposes. To be sure, Boger clearly described her interviews as "forensic." Ordinarily, this would mean that a majority of the statements made to Boger would not qualify as statements made for medical diagnosis or treatment under Evid.R. 803(4) and, therefore, would be inadmissible. *See, e.g., State v. Woods*, 8th Dist. Cuyahoga No. 82789, 2004-Ohio-2700, ¶ 15 (explaining that where a social worker's function does not include diagnosis or treatment, statements made to the social worker are not admissible under Evid.R. 803(4)). The problem with Wagner's positon here, however, is that it was Wagner's counsel who elicited those statements from Boger—not the state. For example:

[Defense counsel]: * * * [I]sn't it true that [J.S.] said that Mr. Wagner scratched her?

* * *

14.

[Defense counsel]:  And she also talked about when Mr. Wagner allegedly did these things to her she was bleeding?

\* \* \*

[Defense counsel]:  And she said it happened every time.  That she was bleeding?

{¶ 33} This is, therefore, an issue of invited error.  "Under the invited-error doctrine, a party will not be permitted to take advantage of an error that he himself invited or induced the trial court to make."  (Internal citations and quotations omitted.) *State ex rel. Mason v. Griffin*, 90 Ohio St. 3d 299, 303, 737 N.E.2d 958 (2000).  Because defense counsel invited the error in the introduction of L.M. and J.M.'s statements through Boger's testimony, we find his second assignment of error not well-taken as it relates to Boger's testimony.

## 2.  Jacqueline Spadaro and Rebecca Dills

{¶ 34} Spadaro and Dills are licensed mental health therapists who diagnose and treat mental and emotional disorders.  Spadaro treated L.M. and Dills treated J.M.  They spoke at length about their diagnoses of the girls and the factors they considered in arriving at their diagnoses.  This included many references to details that the girls provided during their therapy sessions.

{¶ 35} For instance, Spadaro testified that L.M. told her that the abuse began when she was around age seven, occurred mostly at her grandfather's house, and happened every time she went over to her grandparents' house.  L.M. told Spadaro that her

15.

grandfather would lock the door. She said neither of them had pants on, their private parts would touch, and sometimes his penis would go inside of her. She described that it hurt and he did not care because he did not stop. L.M. told Spadaro that after Wagner had sex with her, they would watch the movie "Goonies." She said that she had put her mouth on his penis and touched it with her hands. L.M. told Spadaro that her grandfather showed her pictures of naked girls on a stage. He told her he wanted to stick his penis in her vagina and would tell her that his penis missed her. L.M. said that her grandfather told her that if she had sex with him, he would give her tootsie rolls. She said she was scared and that her grandfather "squished" her by lying on top of her.

{¶ 36} L.M. told Spadaro about feelings of anxiety and fears of being judged by others. Spadaro described that L.M. would plug her ears if her sister talked about the abuse, she avoided her favorite movie because it made her think of her grandfather, and she did not like when her friends talked about their grandparents. Spadaro said that L.M. had flashbacks during the day, she experienced trouble sleeping at night, and she had angry outbursts.

{¶ 37} As part of her therapy, L.M. wrote a letter to her grandfather: "I remember you had sex with me and you hurt my private parts. I want to know why you touched me in the first place, among other things." She did not want to send the letter or share it with her parents.

16.

{¶ 38} Spadaro confirmed that she conducted therapeutic interviews of L.M. and not forensic interviews. She said that based on her assessment of L.M., L.M. had been sexually abused and suffers from post-traumatic stress disorder.

{¶ 39} Dills testified that J.M. identified her abuser as "Papa." J.M. described to Dills that her grandfather yelled at her and told her to get into his bed. She said that he touched her in her lower parts, where her bathing suit would cover. J.M. explained that he would tell her to lie back when he touched her and if she did not, he would push her forehead back. J.M. said that once her grandfather kicked her and she kicked him back. When the abuse happened, her grandfather would lock the door. She wanted to run out, but did not want to hurt his feelings. J.M. said that her grandfather told her "it was the best stuff in the world" and told her not to tell a counselor or he would go to jail. J.M. finally told her parents because she did not feel good about it. J.M. told Dills that she did not want to think about it and did not want her to even say the name "Papa," and she questioned whether she had done the right thing telling her mother. They discussed how J.M. had told her sister before telling her mother.

{¶ 40} J.M. told Dills that she knew that Dills, her mom, and her dad believed her, but was sad because her grandmother did not believe her. She said that she could not talk to her sister because her sister does not want to talk about it. J.M. wanted her mom in the room during her session with Dills, but her mom asked to leave the room.

{¶ 41} Dills testified that based on her counseling of J.M., she would classify her as a child who has been sexually abused. Dills originally diagnosed J.M. with adjustment

17.

disorder with depressed mood. Eventually, Dills identified that J.M. suffers from PTSD. She described that when she first started treating J.M., she complained of stomach pains and headaches. She was crying at school and was having a hard time focusing. She was getting up in the middle of the night, having nightmares and thinking she saw her grandfather. She was wetting the bed.

{¶ 42} Wagner concedes that "some" of the statements admitted through Spadaro and Dills' testimony were properly admitted under Evid.R. 803(4). In fact, we find that all of the statements were properly admitted under that rule. L.M. and J.M. disclosed these details to their therapists in the context of seeking treatment. *See State v. McGovern*, 6th Dist. Erie No. E-08-066, 2010-Ohio-1361, ¶ 37 (finding that statements made by child to mental health therapist were admissible under Evid.R. 803(4)). We find no error in the trial court's ruling with respect to allowing Spadaro and Dills to testify about the statements made by L.M. and J.M. during therapy.

### 3. Melinda Kuebler

{¶ 43} Kuebler is a certified sexual assault nurse examiner. She testified that she was the program manager for the sexual assault unit at NORD Center, an outpatient mental health facility. She described that victims of sexual assault come to the NORD Center for forensic medical evaluations and rape kits. She discussed the protocol they follow. Typically, they begin by getting demographic and contact information from the person who has brought the child there. They then talk with the child, usually with the SANE and the child advocate present, to ask questions and find out from the child why

18.

they are there. They ask the child whether they would like to have their parent or guardian present for the exam, and if they do, they bring the parent or guardian back in.

{¶ 44} The examination is a head-to-toe physical looking at all areas of the body, noting any injury and inquiring about the origin of the injury. They then examine the genitalia. The exam takes two-to-three hours from start to finish. If the child has made any statements, they pass that information along to law enforcement.

{¶ 45} Kuebler testified that on February 13, 2013, she met with L.M. and J.M. J.M. told Kuebler that her grandpa used his nails and fingers on her front and back. She said that she was not supposed to tell anyone, but it started hurting and she did not want to hurt any longer. J.M. refused to allow Kuebler to perform an examination. She said it had been awhile since she had seen her grandpa and she did not need to be looked at.

{¶ 46} L.M. told Kuebler that her grandfather started inappropriately touching her when she was seven years old. She told Kuebler that it hurt. She said it did not bleed but he put his front part in her front part and back part and he used his hands. L.M. told Kuebler she wanted him to stop. Kuebler performed a head-to-toe forensic medical exam on L.M. which included a vaginal exam and exam of her rectal area. She found no evidence of trauma. Kuebler determined that L.M.'s hymen was intact. She explained that it is not unusual for a sexual abuse victim's hymen to remain intact. The hymen does not cover the vagina and it can remain intact despite penetration. She did not perform a rape kit on L.M. because it had been three or four weeks since she last saw her grandfather.

19.

{¶ 47} Kuebler referred to her exam as a "forensic medical examination," however she said that the information she obtains from the victims prior to the examination is strictly for medical purposes and that it assists her in performing her medical examination.

{¶ 48} We find that L.M. and J.M.'s statements provided information that aided in Kuebler's examination and treatment of the victims. They were, therefore, properly admitted under Evid.R. 803(4). *Compare State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 25-56 (finding that the victim's statements about how she met the defendant, and defendant's demeanor after the rape did not aid in any sort of diagnosis or medical treatment). We also find that applying a plain error standard, as we are required to do here because Wagner did not object to Kuebler's testimony about the victim's statements, the admission of these statements was not such that the outcome of the trial clearly would have been different absent the error.

### 4. Corey Mook

{¶ 49} Mook is an officer with the City of Sandusky Police Department. On February 11, 2013, he responded to the call from M.M. and T.M. reporting the abuse. He went to their home. He spoke with M.M. and T.M. first, then spoke individually with each of the girls with their parents present. He told them he heard there were some things that happened at their grandfather's house. The girls told him he had been touching them inappropriately. He asked J.M. where her grandfather had touched her and she pointed to her vaginal area. He asked how long it had been going on and she said it had been quite

20.

some time. He did not ask more specific questions. During his conversation with L.M., she indicated that her grandfather had touched both her vaginal area and her buttocks. He asked how long it had been happening, but does not remember the specific time frame other than that it had been going on for a while. The conversation lasted five to ten minutes and he did not ask for specific details.

{¶ 50} Wagner did not object to Mook's testimony, therefore, we review for plain error. Where an officer testifies as to out-of-court statements in order to explain his or her conduct in an investigation, courts often find the statements to be non-hearsay because they are not being offered for the truth of the matter asserted. *See State v. Ricks,* 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 20-24. This does not seem to be the context for offering the girls' statements through Mook. Also, it cannot be argued that the statements made to Mook were made for medical purposes, therefore, Evid.R. 803(4) did not provide a basis for allowing Mook to testify as to the girls' statements. However, Mook did not ask the girls for any details beyond the fact that the inappropriate touching had occurred, that Wagner had allegedly touched J.M.'s vaginal area and L.M.'s vaginal area and buttocks, and that it had been happening for a while. The girls had already testified to these facts in much greater detail, thus this was not the first time the jury heard these allegations. Mook provided no additional details. We, therefore, find that the outcome of the trial was not affected by the admission of these statements.

21.

## 5. T.M. and M.M.

{¶ 51} T.M. testified that on February 9, 2013, J.M. told her: "I have to tell you something. * * * Your papa has been doing this to me * * *." T.M. asked her if she had told anyone else and she said she had told L.M., and that L.M. told her he had been doing the same thing to her. T.M. approached L.M. and L.M. confirmed that her grandfather had been touching her. When T.M. asked where, L.M. pointed to "her front privates" and "her bottom."

{¶ 52} T.M. told her husband, M.M. T.M. and M.M. sat down with the girls and told them that the situation was very important and very serious. They asked the girls if they were sure they were telling the truth and they both said yes. T.M. and M.M. did not ask for any additional details.

{¶ 53} M.M. called the Sandusky police. When the officers came, one of them talked to the girls. He did not ask very many questions. They determined it was the wrong jurisdiction and they needed to call the Erie County sheriff. The sheriff's office sent an officer over to talk to the girls. An interview was set up with ODJFS on February 13, 2013. Each child was interviewed separately by Boger. T.M. said that she did not know what the girls were going to say because she did not ask them any details—she said she did not want to know. After the interview, Boger came out to talk to them and she said it was worse than they thought. She said Wagner would make L.M. watch sex tapes then make her do what they saw in the tapes, which included having sex with her. This was the first time T.M. or M.M. had heard this.

22.

{¶ 54} T.M. testified that she is the one who washes the kids' clothes, but she never saw blood on her daughters' underwear or anything unusual on their clothing. T.M. said she had taken the girls to her parents' house on February 9, 2013, to give her dad a birthday gift. J.M. was holding her stomach saying she did not feel good. Wagner also said he did not feel well and did not want to get the kids sick, so they just dropped off the present and she took the kids home. The girls did not go in the house.

{¶ 55} Although both T.M. and M.M. testified that Boger told them it was worse than they thought and that Wagner had been having sex with L.M., Wagner failed to object the first time T.M. testified to this, and he failed to object when M.M. testified to this. Because he failed to object, we again review for plain error. We find that the admission of these statements did not affect the outcome of the trial. This is especially true given that Boger herself had already testified that what the girls had told her was "much, much worse" than what their parents originally believed.

{¶ 56} Finally, Wagner argues that the improper admission of multiple hearsay statements caused prejudice by duplicating testimony. Because we have found that the admission of out-of-court statements was either not improper or was harmless, we find no merit to this contention.

{¶ 57} We find Wagner's second assignment of error not well-taken.

### C. Prosecutorial Misconduct

{¶ 58} In his fourth assignment of error, Wagner claims that he was deprived of a fair trial by the intentional and repeated misconduct of the assistant prosecutor who tried

23.

the case. He contends that virtually all of the important testimony elicited from the children was leading. He also claims that the prosecutor asked leading questions of the adults who testified, often cut off their answers, and elicited inadmissible hearsay and opinion evidence. And he contends that the state "discarded any remaining veil of propriety" during closing argument.

{¶ 59} To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was improper and prejudicially affected the defendant's substantial rights. *State v. Walker*, 1st Dist. Hamilton No. C-060910, 2007-Ohio-6337, ¶ 45. "[A] reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, ¶ 50 (6th Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). "Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming." *State v. Oviedo*, 6th Dist. Lucas No. L-95-287, 1997 WL 525087, *2 (Aug. 15, 1997), citing *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 60} We discuss the various conduct of the prosecutor that Wagner claims deprived him of a fair trial. We will not address his hearsay arguments, as those were addressed previously in this decision.

24.

### 1. Leading Questions Posed to the Children

{¶ 61} With respect to the children's testimony, Wagner complains that the prosecutor began her questioning by asking, "Okay. You have talked to me about your grandfather, right?" "Okay. When we talked, you told me he did some bad things to you." Wagner asserts that this was improper leading. Evid.R. 611(C) provides that leading questions may not be used on direct examination "except as may be necessary to develop" the witness' testimony. The Ohio Supreme Court has recognized that "it is within the trial court's discretion to allow leading questions on direct examination." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 163, citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993). As such, the court has held that a prosecutor does not commit misconduct in engaging in "conduct that the trial court had discretion to allow and did allow." *Id.*

{¶ 62} This is especially true where the witness is a child of tender years. For instance, in *State v. Holt*, 17 Ohio St.2d 81, 83, 246 N.E.2d 365 (1969), the court emphasized that the trial court has broad discretion in allowing the state to use leading questions to develop the testimony of children who are the alleged victims of sexual offenses.

{¶ 63} Before L.M.'s exam began, Wagner's counsel approached the bench to express concern about the state's use of leading questions. It was acknowledged by all parties that it was within the trial court's discretion whether to allow leading questions. The court agreed to monitor the use of leading questions. During J.M.'s testimony,

25.

Wagner objected to only one leading question after J.M. indicated that she did not remember the last time her grandfather "did something bad" to her. The court sustained that objection. Wagner made no further objections. We find no abuse of discretion in the trial court allowing the state to ask leading questions, and after reviewing the testimony in its entirety, we do not find that the state's questioning rose to a level where it can be said that the state's attorney put "words," "concepts," and "allegations" in the children's mouths, as Wagner suggests she did.[1]

## 2. Improper Opinion Testimony

{¶ 64} Wagner also claims that the prosecutor improperly elicited opinions from Spadaro and Dills, in particular, as to whether the children had been sexually abused. He claims this was error because the state never qualified the witnesses as experts and because the state did not comply with Crim.R. 16(K) in that it failed to provide a report of the therapists' opinions in advance of trial. Wagner raised the objection to the admission of the opinions and the purported Crim.R. 16 violation during trial. With respect to the Crim.R. 16(K) claim, the court overruled the objection because Wagner had been provided with a majority of the therapy notes before trial and those notes contained the therapists' diagnoses. The court explained: "So the Court finds that there's sufficient evidence in this documentation for her to be able to issue [an opinion as to whether L.M.

---

[1] Wagner also complains that the trial court was going to allow the state to play the taped interviews of the children, which the state argued (in a sidebar) would bolster "the fact that the interview was properly done based on her training." However, the tapes were never played.

26.

was abused] that based on her training and experience and what has been provided [sic]. The Court doesn't find that discovery Rule 16 has been violated."

{¶ 65} During Spadaro's examination, the trial court repeatedly referenced the fact that it was appropriate for her to render opinions about whether L.M.'s behavior was consistent with someone who had been sexually abused. This is consistent with Ohio Supreme Court case law. In *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998), the court specifically held that "An expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence."

{¶ 66} When Dills testified, the state asked her whether "based on your counseling with [J.M.], did you—and I want to word this correctly. I mean, would you have classified her as a child who has been abused. * * * And I mean sexually abused." Dills responded "yes." Dills explained that the "deciding factor" in characterizing J.M. as a victim of sexual abuse was that "she'd been crying a lot. She'd been having nightmares. She'd been wetting – she had wet – incidents of wetting the bed, which is a definite symptom of sexual abuse."

{¶ 67} Wagner's stronger objection, however, is to Spadaro's testimony. The prosecutor asked Spadaro if there are criteria that she looks at in determining whether a child has been sexually abused. She responded, "absolutely," at which point the defense registered an objection and a sidebar took place. The trial court overruled the defense's objection, and the state asked whether L.M. had been sexually abused. Spadaro

27.

responded "yes."  The state asked her if she based that opinion on what was contained in her counseling records and she said yes.

{¶ 68} Spadaro was asked if she had come to a diagnosis with respect to L.M., and she responded that her diagnosis was PTSD.  She explained the criteria for PTSD and described which diagnostic criteria L.M. met.  During another sidebar, the court reiterated that Spadaro could provide opinions about whether L.M. had been abused based on whether her behavior was consistent with that of a child who had been abused, but she could not opine as to L.M.'s truthfulness.

{¶ 69} The state questioned Spadaro at length about statements L.M. made during therapy.  Yet another sidebar convened and the court said again that Spadaro could testify that L.M.'s behavior is consistent with that of a sexual abuse victim, but could not testify that L.M. was being truthful.  The court then explained to the jury:

> An expert witness can testify to the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children. * * * The behaviors are consistent, okay?  That's okay.
>
> An expert cannot testify that the—the victim is being truthful. That's for you to decide whether or not the victim is being truthful.  The victim—or the expert also cannot testify that a particular person actually did the event.  That's for you to decide.  So whether the victim is being truthful, that's for your decision, not the expert's, and whether or not this defendant on trial did it, that's for you to decide, not this expert.

28.

Now, what the expert can also testify to, outside of the behavior consistent with someone that's been sexually abused, they can also testify under the medical exception, as we call it, as to what the victim told 'em. * * * It would be on a hearsay issue, but it's coming in under the medical exception * * *. She's not testifying that [L.M.] was being truthful with her. She's just telling you what [L.M.] said.

{¶ 70} After Spadaro finished reading her therapy notes, the state asked her whether "based on your interviews, and things that we reviewed here, and applying your knowledge, you came to a determination that –." The court, sensing that an objection was forthcoming, ordered the attorneys to approach. Afterwards, it instructed the state that Spadaro could "come to the conclusion that the behavior is consistent with someone that's sexually abused." The state then asked:

Q: Based on everything that you've gone through, based on what we've talked about here, based on some of the reports that we did not discuss, based on that, you came to a conclusion that she had been sexually abused?"

Spadaro responded: "Yes, from what she tells me."

29.

The state asked:

> Q: The other—and basically what you're telling me is that the indicators that she has shown are consistent with child abuse. I guess that would be a proper way to ask it.
>
> A: Yes.

{¶ 71} Wagner did not object to these two questions, so again, we review for plain error. Upon reviewing Spadaro's testimony in its entirety, we observe that at times, the state elicited testimony that verged on opinions about L.M.'s truthfulness. But any harm from this was prevented by the court's clear admonition to the jury during the questioning which made clear that it was for the jury—not for the witness—to draw conclusions about the veracity of L.M.'s allegations. The court reminded the jury of this again when it instructed the jury following closing arguments. We find, therefore, that no plain error occurred.

### 3. Therapy Notes

{¶ 72} Wagner complains that Spadaro, Dills, and Kuebler read from their treatment notes at trial. He claims this was improper under Evid.R. 612. We observe once again that no objection was raised at trial to the witnesses reading from their therapy and treatment records. In fact, Wagner's counsel specifically acknowledged that Kuebler could testify from her report.

{¶ 73} In *State v. Murphy*, 65 Ohio St.3d 554, 580, 605 N.E.2d 884 (1992), the Ohio Supreme Court considered whether the trial court had erred by permitting a police

30.

officer to read from his report rather than testify from memory. Appellant argued that his use of the report was not limited to refreshing his recollection as required by Evid.R. 612. The court, recognized that "[t]he extent to which a witness may refresh his memory from records made by him in the regular course of business lies within the sound discretion of the trial court," and, therefore, found no error. *Id.*, quoting *Weis v. Weis*, 147 Ohio St. 416, 72 N.E.2d 245 (1947), paragraph one of the syllabus. We reach the same conclusion here and we find no plain error and no abuse of discretion in the trial court allowing Spadaro, Dills, and Kuebler to read from their treatment records.

### 4. Cross-Examination

{¶ 74} Wagner claims that the prosecutor acted improperly by "badgering" defense witnesses and that she "absolutely savaged" Wagner's wife. He complains that she subjected Wagner's wife to insinuatingly leading questions with improper representations of purported facts. Some of the examples Wagner identifies involve allegations that Wagner kept a gun under his pillow, and that although disabled, Wagner had enough "good days" to have enabled him to abuse his granddaughters. Other instances identified by Wagner include questions posed to his wife about whether she knows that a limp penis can penetrate a vagina, that Wagner used his finger up and down, and that he had a porno movie at their home.

{¶ 75} Although Wagner entered a number of objections during the state's cross-examination of his wife, he did not raise the particular objections that he now raises on appeal. Again, we review for plain error. "Prosecutorial misconduct rises to plain error

only if it is clear that a defendant would not have been convicted in the absence of the improper comments." (Internal citations omitted.) *State v. Marcum*, 4th Dist. Gallia No. 12CA6, 2013-Ohio-5333, ¶ 38.

{¶ 76} "It is well-settled that the scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge." (Internal quotations and citations omitted.) *State v. Boles*, 6th Dist. Lucas No. L-07-1255, 2009-Ohio-512, ¶ 44. Here, the court ordered a separation of witnesses. Many of the questions posed to Wagner's wife inquired whether she was aware of the testimony of various witnesses who testified before her which directly contradicted the defense's position which had been developed, in part, through Mrs. Wagner's testimony. Although at times the cross-examination was aggressive, we find that it was not such that Wagner would not have been convicted absent the alleged impropriety in the questioning of his wife.

### 5. Closing Argument

{¶ 77} Wagner argues that the state's attorney made improper statements in her closing argument. He claims that she argued facts not in evidence, such as that Wagner "used his tongue," that he had "more complicated sex" with L.M. than with J.M., that both counselors determined that the girls were sexually abused, and that once or twice Wagner put his finger up L.M.'s rectum. He also claims that during her closing argument, the assistant prosecutor personalized the issues for the jury, asking them to bring back a guilty verdict for the girls. She also implied that Wagner could not have

32.

been falsely accused because there was an investigation before bringing charges, and there were safeguards in place such as the counselors and prosecutors talking to the children. During her closing, she also made the following statement:

> Defendant infers that I'm—I must be dumb. Because it came—it was very evident that I talked to these girls, that I wouldn't see if they were falsely accusing somebody? * * * That I, myself, would bring a falsely accused person in this Courtroom? No, that's not going to happen and it didn't happen in this case.

**{¶ 78}** Defense counsel objected and the trial court struck these statements, but Wagner claims the damage was done because the jury heard them.

**{¶ 79}** "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments." *Boles*, 6th Dist. Lucas No. L-07-1255, 2009-Ohio-512, 2009-Ohio-512, at ¶ 47, citing *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996). During closing, a prosecutor may comment on what the evidence has shown and what reasonable inferences may be drawn from the evidence. *Id.* "Isolated incidents of prosecutorial misconduct are harmless, thus the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *Id.*, citing *State v. Stevens*, 2d Dist. Montgomery No. 19572, 2003-Ohio-6249.

**{¶ 80}** Clearly, the argument of the state's attorney insisting that she can identify a false accusation and denying that she would bring a falsely accused person to trial went well beyond appropriate argument. However, the inappropriate comment was swiftly

33.

objected to and stricken. The jury is presumed to follow the trial court's instructions, including any curative instructions. *State v. Tibbetts*, 92 Ohio St.3d 146, 170, 749 N.E.2d 226 (2001). As for the other purported misconduct of which Wagner complains, the testimony supported the statements made by the prosecutor.

{¶ 81} We find Wagner's fourth assignment of error not well-taken.

### D. Sufficiency and Manifest Weight of the Evidence

{¶ 82} In his third assignment of error, Wagner claims that there was insufficient evidence to support his conviction and that his conviction was against the manifest weight of the evidence. In support of his claim of insufficiency of the evidence, Wagner asserts that absent the testimony "put in [the] children's mouths by the assistant prosecutor," the testimony did not support the allegations of partial intercourse, digital penetration, and oral sexual contact. He also claims that even setting aside the problem of leading questions and improper evidence, there was no specificity as to when and how often the offenses happened.

{¶ 83} In support of his claim that the convictions were against the manifest weight of the evidence, he argues that in the absence of the inadmissible evidence, there was no specific evidence to convict him of anything. He also claims that there was no evidence of penetration to support ten counts of rape. He says that there were significant discrepancies between what the investigators and counselors reported the children said and that it was presumed that abuse happened "all the time" or "every time" even though the children said that some things happened only occasionally, if at all.

34.

**{¶ 84}** Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

**{¶ 85}** When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

35.

**{¶ 86}** Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

**{¶ 87}** In arguing that his conviction was not supported by the sufficiency of the evidence and was against the manifest weight of the evidence, Wagner's main contention is that the convictions were obtained "solely through improper leading questions, inadmissible hearsay, impermissible 'expert' opinions, and prosecutorial misconduct." As we have previously addressed each of these complaints and found them to be without merit, we reach the same conclusion here.

**{¶ 88}** Wagner also urges that there was no specificity as to when or how often the abuse occurred. He claims that his Crim.R. 29 motion for acquittal should, therefore, have been granted. However, "[i]t is well established that, particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity. In such cases, the prosecution must set forth a time frame in the indictment and charge the accused with offenses which reasonably fall within that period." (Internal citations omitted.) *State v. Daniel*, 97 Ohio App.3d 548, 556-57, 647 N.E.2d 174 (10th Dist.1994). That is precisely what happened here.

36.

{¶ 89} We find Wagner's third assignment of error not well-taken.

### E. Cumulative Error

{¶ 90} Wagner claims that cumulative error deprived him of a fair trial. He again complains that "the trial court made numerous errors in permitting abuse of leading questions, permitting improper opinion evidence, permitting inadmissible hearsay, permitting reading and admitting clinical notes, and failing to constrain prosecutorial misconduct." Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly. *State v. Williams*, 149 Ohio App.3d 434, 2002-Ohio-4831, 777 N.E.2d 892, ¶ 36 (6th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). We have previously addressed each of Wagner's contentions and found no error. It follows that we find no cumulative error either.

{¶ 91} Wagner also complains that the trial court ordered an investigation into the prosecutor's assertion that defendant's family "accosted" one of the state's witnesses, ejected a member of defendant's family from the courtroom in open court, and admonished the defense for asking leading questions while not applying the same standard to the state. "A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 51. *See also State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, ¶ 34 (explaining that trial court's

37.

decision to remove spectator from courtroom is reviewed for abuse of discretion). After reviewing the transcript in its entirety, we find no abuse of discretion here.

{¶ 92} We find Wagner's fifth assignment of error not well-taken.

### F. Restitution

{¶ 93} In his sixth assignment of error, Wagner claims that the trial court erred by ordering restitution totaling $5,975.52 to L.M. and J.M.'s parents, which included $1,585.52 for L.M. and J.M.'s out-of-pocket counseling expenses, $390 for T.M.'s counseling expenses, and $4,000 for missed time at work by T.M. and M.M. Wagner asserts that under R.C. 2929.18(A)(1), the trial court was not authorized to order restitution to T.M. and M.M. The state ignores the issue raised by Wagner—i.e., whether the court lacked authority to order restitution to a third party—and focuses solely on whether Wagner is financially able to pay a restitution award.

{¶ 94} Again, we conduct a plain-error analysis because Wagner did not object to the restitution order in the trial court.

{¶ 95} Under R.C. 2929.18(A)(1), the court may impose financial sanctions, including:

> Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. If the court imposes restitution, the court shall order that the restitution be made to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of

courts, or to another agency designated by the court. If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount. All restitution payments shall be credited against any recovery of economic loss in a civil action brought by the victim or any survivor of the victim against the offender.

{¶ 96} In *State v. Huston*, 12th Dist. Clinton No. CA2010-12-020, 2011-Ohio-3912, ¶ 16, the defendant was ordered to pay to the victim's mother the cost of testing the victim for sexually transmitted diseases. The court held that because the victim's mother was responsible for the medical costs incurred by her minor daughter, the trial court's decision was not the equivalent of ordering restitution to an improper third party.

{¶ 97} We agree with *Huston* and find that in this case, it was proper for the trial court to order that restitution be made to T.M. and M.M. for the cost of their daughters'

counseling.  However, we find that the trial court was without authority under R.C. 2929.18(A)(1) to order Wagner to pay the cost of T.M.'s counseling or T.M. and M.M.'s lost wages.  It was plain error for those expenses to have been included in the restitution order.

{¶ 98} We find Wagner's sixth assignment of error well-taken in part, and not well-taken, in part.

### III.  Conclusion

{¶ 99} We find Wagner's sixth assignment of error well-taken, in part, and not well-taken, in part, but we find his remaining assignments of error not well-taken.  We remand this matter so that the trial court can amend its June 25, 2014 judgment to reduce the amount of restitution by $4,390, omitting amounts ordered as restitution for T.M.'s therapy and for T.M. and M.M.'s missed time at work.  The costs of this appeal are assessed equally to Wagner and the state under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                                JUDGE
Stephen A. Yarbrough, P.J.

James D. Jensen, J.                     _____
CONCUR.                                                     JUDGE

                                                        _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.

41.